# United States Court of Appeals
## For the First Circuit

No. 13-2144

FRESENIUS MEDICAL CARE HOLDINGS, INC.,

Plaintiff, Appellee,

v.

UNITED STATES OF AMERICA,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]

Before

Thompson, Baldock[*] and Selya,
Circuit Judges.

Anthony T. Sheehan, Attorney, Tax Division, United States Department of Justice, with whom Kathryn Keneally, Assistant Attorney General, Tamara W. Ashford, Principal Deputy Assistant Attorney General, Carmen M. Ortiz, United States Attorney, Gilbert S. Rothenberg, Attorney, Tax Division, and Bruce R. Ellisen, Attorney, Tax Division, United States Department of Justice, were on brief, for appellant.
James F. Bennett, with whom William H. Kettlewell, Maria R. Durant, Megan S. Heinsz, Collora LLP, and Dowd Bennett LLP were on brief, for appellee.

August 13, 2014

---

[*] Of the Tenth Circuit, sitting by designation.

**SELYA, Circuit Judge.** This tax-refund litigation requires us to explore the uncertain terrain surrounding the tax treatment of settlement payments made under the False Claims Act (FCA), 31 U.S.C. §§ 3729-3733. We hold, as a matter of first impression in this circuit, that in determining the tax treatment of an FCA civil settlement, a court may consider factors beyond the mere presence or absence of a tax characterization agreement between the government and the settling party. While this holding may be at odds with the decision in Talley Industries Inc. v. Commissioner, 116 F.3d 382 (9th Cir. 1997), we are convinced that generally accepted principles of tax law compel us to part company with the Ninth Circuit.

The case before us involves the tax treatment of roughly $127,000,000 paid to the government in partial settlement of a kaleidoscopic array of claims. The district court concluded that where, as here, the parties had eschewed any tax characterization, the critical consideration in determining deductibility was the extent to which the disputed payment was compensatory as opposed to punitive. At trial, the court's jury instructions embodied this conclusion and directed the jury's focus to the economic realities of the situation. The jury split the baby and found that a large chunk of the money ($95,000,000) was deductible. Accepting this finding, the court ordered tax refunds which, with accrued interest, totaled more than $50,000,000.

The government appeals.  We take note of the district court's skillful handling of this complicated litigation, and we affirm.

## I.   BACKGROUND

Fresenius Medical Care Holdings, Inc. is a major operator of dialysis centers in the United States and around the world. Between 1993 and 1997, whistleblowers brought a series of civil actions against Fresenius[1] under the FCA.  The government paid heed and, in 1995, a number of government agencies opened civil and criminal investigations into Fresenius's dealings with various federally funded health-care programs.  Because the FCA was in play, Fresenius faced potential liability for treble damages.  See 31 U.S.C. § 3729(a).

In 2000, Fresenius entered into a complex of criminal plea and civil settlement agreements with the government.  These agreements called for Fresenius to pay, in the aggregate, $486,334,232, $101,186,898 of which was earmarked as criminal fines.  The remainder — $385,147,334 — was the price for Fresenius's absolution from civil liability.

The civil settlement agreements released a gallimaufry of claims against Fresenius (including claims under the FCA).  Of

_____

[1] These actions were originally brought against National Medical Care, Inc. (NMC), which thereafter was acquired by Fresenius. For ease in exposition, we refer to Fresenius, NMC, and NMC's subsidiaries, jointly and severally, as Fresenius.

paramount pertinence for present purposes, these agreements eschewed any commitment as to how the payments were to be treated for tax purposes.

Despite the global nature of the settlement, a new dispute soon enveloped the parties. This dispute centered on the tax treatment of the sums paid. Over time, the parties pared the scope of their dispute: they agreed that the amounts paid as criminal fines, totaling $101,186,898, were not deductible; and that, out of the payments required by the civil settlement agreements, an amount equal to single damages under the FCA ($192,550,517) was deductible. They could not agree to the tax treatment of the balance of the civil settlements ($192,596,817).

Acting under protest, Fresenius filed amended tax returns that took no deduction for this balance. Following an administrative appeal, the government conceded that a further figure equal to the amount owed to the FCA whistleblowers as qui tam relators ($65,800,555), see id. § 3730(d), was deductible. Fresenius then commenced a tax-refund action in the United States District Court for the District of Massachusetts for the purpose of determining the deductibility of the amount still in dispute ($126,796,262). See 26 U.S.C. § 7422.

After some preliminary skirmishing, the district court convened a jury trial. At the close of all the evidence, the court reserved decision on the government's Rule 50 motion for judgment

-4-

as a matter of law and submitted the tax characterization question to the jury. The jury found that $95,000,000 was deductible. The court then denied the reserved motion.

In the aftermath of the jury verdict, the parties stipulated to the verdict's tax effects. Thereafter, the court entered judgment for Fresenius in the amount of $50,420,512.34, see Fresenius Med. Care Holdings, Inc. v. United States, No. 08-12118, 2013 WL 1946216, at *1 (D. Mass. May 9, 2013), and denied the government's renewed motion for judgment as a matter of law. This timely appeal followed.

## II. ANALYSIS

In this venue, the government advances two claims of error. Its first claim of error challenges the district court's denial of its motions for judgment as a matter of law and, therefore, engenders de novo review. See Palmquist v. Shinseki, 689 F.3d 66, 70 (1st Cir. 2012). Its second claim of error challenges the district court's jury instructions and, as framed, likewise engenders de novo review. See DeCaro v. Hasbro, Inc., 580 F.3d 55, 61 (1st Cir. 2009) (explaining that de novo review obtains when a claim of instructional error contends that jury instructions failed to "capture the essence of the applicable law"). We address these claims of error sequentially.

## A. **Judgment as a Matter of Law.**

The government moved for judgment as a matter of law at the close of all the evidence and renewed its motion following the verdict. See Fed. R. Civ. P. 50(b). Each time, the district court rejected the government's motion. The government now challenges these rulings.

When the denial of a Rule 50(b) motion is appealed, a reviewing court must view the evidence in the light most flattering to the verdict and must draw all reasonable inferences therefrom in favor of the verdict. See Casillas-Díaz v. Palau, 463 F.3d 77, 80-81 (1st Cir. 2006). The challenge will succeed only if reasonable minds, viewing the evidence in this light, "could not help but reach an outcome at odds with the verdict." Mandel v. Bos. Phoenix, Inc., 456 F.3d 198, 208 (1st Cir. 2006) (internal quotation mark omitted).

As a working principle, a motion for judgment as a matter of law ordinarily falls into one of two generic categories. The first (and most common) type of motion challenges evidentiary sufficiency; that is, whether the evidence of record, when taken most favorably to the nonmoving party, is adequate to prove a case under an uncontroversial legal regime. See, e.g., Cook v. R.I. Dep't of Mental Health, Retardation, & Hosps., 10 F.3d 17, 21 (1st Cir. 1993). The second type of motion tests the applicable law; its focus is less on the evidence and more on whether the verdict,

as rendered, depends on an incorrect legal regime. See, e.g., Grande v. St. Paul Fire & Marine Ins. Co., 436 F.3d 277, 280-81 (1st Cir. 2006).

This case is of the latter stripe. The government concedes (or, at least, does not contest) that the verdict is based on a sufficient evidentiary foundation under the legal regime explicated by the district court. It argues, however, that this legal regime is faulty and that, under a correct legal regime, the evidence is insufficient to sustain the verdict. We turn, then, to the applicable law.

The foundational elements of the relevant tax law are easily summarized. The Internal Revenue Code allows a business to deduct all of its "ordinary and necessary expenses paid or incurred during the taxable year." 26 U.S.C. § 162(a). Because tax deductions "are matters of legislative grace[,] the taxpayer bears the burden of proving entitlement to any deduction." MedChem (P.R.), Inc. v. Comm'r, 295 F.3d 118, 123 (1st Cir. 2002) (citing INDOPCO, Inc. v. Comm'r, 503 U.S. 79, 84 (1992)).

Congress has ordained that no deduction may be made "for any fine or similar penalty paid to a government for the violation of any law." 26 U.S.C. § 162(f). Implementing regulations provide that the universe of nondeductible fines includes "civil penalt[ies]" as well as amounts "[p]aid in settlement of . . . potential liability" for any nondeductible fine or penalty.

-7-

26 C.F.R. § 1.162-21(b). Withal, "[c]ompensatory damages . . . paid to a government do not constitute a fine or penalty." Id. So viewed, a critical distinction exists between items such as fines or penalties (which are nondeductible) and items such as compensatory damages (which are deductible).

This taxonomy interfaces awkwardly with the FCA's provision for treble damages. See 31 U.S.C. § 3729(a). Single damages are plainly compensatory and, thus, plainly deductible. See 26 C.F.R. § 1.162-21(c) (providing, in example 1, for deductibility of actual damages recovered under an analogous statute). But that is not the end of the matter; some amounts in excess of single damages generally are regarded as compensatory, see Cook Cnty. v. United States ex rel. Chandler, 538 U.S. 119, 130-31 (2003), and therefore deductible. This makes good economic sense: an enforcement action following a fraud brings new costs and delays and requires a recovery of more than single damages to make the government whole. See id.; see also United States v. Bornstein, 423 U.S. 303, 315 (1976) (describing FCA multiple damages as "necessary to compensate the Government completely for the costs, delays, and inconveniences occasioned by fraudulent claims"). Such additional costs may include — but are not limited to — the expenses of prosecuting the action and the time-value of the delayed receipt of single damages (generally represented by an

-8-

imputation of interest).  See, e.g., Chandler, 538 U.S. at 131; see also Fresenius, 2013 WL 1946216, at *5-6.

While these legal principles are uncontroversial, plotting the sometimes hazy line that separates the compensatory from the punitive can be tricky business.  See Chandler, 538 U.S. at 130 (acknowledging that "the tipping point between payback and punishment defies general formulation").  That difficult line-drawing exercise is central to the case at hand.

At trial, Fresenius exhibited its recognition of the dichotomy between compensatory and punitive payments.  To this end, it introduced evidence of the compensatory nature of the disputed sums.  The district court also recognized this dichotomy.  It began its appraisal by confirming that the civil settlement agreements "unambiguously decline to address the punitive or compensatory nature of the settlement payments for [tax] purposes."  Fresenius, 2013 WL 1946216, at *7.  In the absence of any agreement by the parties, the court tasked the jury with determining "what amount [was] necessary to put the government in the position it would have been in had Fresenius not" engaged in the underlying misconduct. In essence, the court — after placing the burden of proof on Fresenius — asked the jury to measure deductibility in terms of the economic realities of make-whole remediation.

The government takes umbrage with this approach.  It asseverates that the absence of an agreement between the parties as

to whether the payments will be deductible defeats Fresenius's claim of deductibility. In advancing this asseveration, the government assigns talismanic significance to the presence or absence of a tax characterization agreement between the settling parties.

The government's position is founded almost exclusively on the decision in Talley. Like this case, Talley involved the tax treatment of an FCA settlement. See Talley, 116 F.3d at 384-85. The Ninth Circuit started from the common understanding that FCA multiple damages can serve either compensatory or punitive purposes.[2] See id. at 387. To the extent that the settlement sum exceeded single damages, the court reasoned, the case presented a question "as to the characterization and the purpose of" that portion of the settlement. Id. Because the settlement agreement failed to provide clarity, the court remanded to the Tax Court and directed that this question be answered by examining "whether the parties intended the payment to compensate the government . . . or to punish" the taxpayer. Id. In the process, the court stressed that the taxpayer bore the burden of proving eligibility for deductions and, therefore, would suffer the consequences of any lack of evidence as to the parties' intent. See id. at 387-88.

---

[2] At the time material to the Talley decision, the FCA provided for double damages rather than treble damages. See Talley, 116 F.3d at 386-87. We agree with the parties and the district court that, for present purposes, this distinction makes no difference.

The government argues that the <u>Talley</u> court's analytic approach creates a rule requiring that any FCA civil settlement sums in excess of single damages (except, perhaps, whistleblowers' fees) be treated as punitive fines (and, thus, nondeductible) unless the parties have manifested a contrary intention. As the government reads <u>Talley</u>, that manifested intent can be proven only by showing a tax characterization agreement between the government and the taxpayer. In its view, <u>Talley</u> suggests that economic reality has no bearing. Building on this foundation, the government argues that the court below should have entered judgment in its favor as a matter of law once it found that the parties had abjured any tax characterization agreement.

We cannot accept the government's rationale. A rule that requires a tax characterization agreement as a precondition to deductibility focuses too single-mindedly on the parties' manifested intent in determining the tax treatment of a particular payment. Such an exclusive focus would give the government a whip hand of unprecedented ferocity: it could always defeat deductibility by the simple expedient of refusing to agree — no matter how arbitrarily — to the tax characterization of a payment.

Moreover, an exclusive focus on manifested intent, such as the government proposes, would be an anomaly in tax law. When mulling transactions between private parties, courts that are required to make tax characterizations typically look to substance

— that is, the economic reality of the particular transaction, objectively viewed — rather than to the form chosen by the parties. See, e.g., United States v. Eurodif S.A., 555 U.S. 305, 317-18 (2009); Boulware v. United States, 552 U.S. 421, 429-30 (2008); Neb. Dep't of Revenue v. Loewenstein, 513 U.S. 123, 134 (1994); Frank Lyon Co. v. United States, 435 U.S. 561, 573 (1978); Helvering v. F. & R. Lazarus & Co., 308 U.S. 252, 255 (1939); Palmer v. Bender, 287 U.S. 551, 555-56 (1933). Logic suggests that this approach ought to apply equally to the tax treatment of settlement payments. See, e.g., Francisco v. United States, 267 F.3d 303, 321-22 (3d Cir. 2001); Delaney v. Comm'r, 99 F.3d 20, 23-24 (1st Cir. 1996). In that context, too, "court[s have] the right — indeed, the duty — to look beyond the language subscribed to by the parties." Rozpad v. Comm'r, 154 F.3d 1, 4 (1st Cir. 1998) (internal quotation marks omitted). Substance matters.

This is not to say that the intent of the settling parties is immaterial. It is not. See Francisco, 267 F.3d at 319 (explaining that the "intent of the payor" of a settlement, though not dispositive, is often "the most persuasive evidence of the nature of claims settled"). If the government and a defendant settle an FCA claim and specifically agree as to how the settlement will be treated for tax purposes, it is hard to envision any reason why a reviewing court should not honor that agreement.

But that is not this case.  Here, the parties did not agree on the tax characterization of the civil settlement payments (indeed, during the negotiations leading to the settlement, the government apparently refused to discuss tax consequences). Rather, the parties' manifested intent with respect to deductibility was expressed as an agreement not to agree; they intentionally left the question open.  Under generally accepted principles of tax law, a court's inquiry should then shift to the economic realities of the transaction.

The government resists this common-sense approach. Relying solely on Talley, it argues that the FCA settlement context is special and that economic reality is irrelevant.[3]  It insists that the only pertinent inquiry is one that seeks to determine whether a tax characterization agreement exists between the government and the settling party.  We disagree.

Talley offers an indistinct beacon by which to steer. The case is distinguishable on its facts and its message is unclear.  If Talley stands for the proposition asserted by the

_____

[3] One reason that the FCA context is special, the government suggests, is that the government is a party both to the settlement agreement and to the tax dispute. But the tax treatment of a transaction is determined by the provisions of the Internal Revenue Code, and the fact that one party to a transaction is the government itself does not alter this truism.  See Wash. Mut. Inc. v. United States, 636 F.3d 1207, 1221 (9th Cir. 2011).

-13-

government,[4] then Talley is incorrectly decided and does not deserve our allegiance.

The government's proposed rule is also in serious tension with yet another fundamental tenet of tax law. This tenet holds that amounts paid or received in settlement should receive the same tax treatment, to the extent practicable, as would have applied had the dispute been litigated and reduced to judgment. See, e.g., Lyeth v. Hoey, 305 U.S. 188, 196 (1938); Freda v. Comm'r, 656 F.3d 570, 574 (7th Cir. 2011); Alexander v. IRS, 72 F.3d 938, 942 (1st Cir. 1995). The government's position here inters that tenet in the graveyard of forgotten canons.

When an FCA claim is tried rather than settled, there will perforce be no characterization agreement available to guide the tax treatment of awarded damages. Nevertheless, some portion of the award beyond single damages may subsequently be found to have a compensatory purpose. See Chandler, 538 U.S. at 130-31; Bornstein, 423 U.S. at 315. Hence, that portion of the award will

---

[4] It is debatable whether Talley actually stands for this proposition. Although the government's reading is not an unnatural one, it may be seeing more in Talley than the decision portends. On remand following the Ninth Circuit's decision in Talley, the Tax Court appeared open to considering the economic substance of the settlement, but was unable to go down that path because the parties had not developed an appropriate factual record. See Talley Indus. Inc. v. Comm'r, 77 T.C.M. (CCH) 2191, 2196 (1999) (noting that "[n]either party made a serious effort to quantify the Government's actual losses in excess of its 'singles' damages"), aff'd, 18 F. App'x 661 (9th Cir. 2001). In contrast, Fresenius meticulously developed just such a record.

be deductible.  See 26 C.F.R. § 1.162-21(b).  The same result logically should obtain in the settlement context.  Thus, a rule that requires a tax characterization agreement as a precondition to deductibility would produce an infelicitous asymmetry.

We are not insensitive to the government's fear that refusing to require a tax characterization agreement not only makes the eventual deductibility of settlement payments difficult to predict but also may create perverse incentives.[5]  But such policy considerations cannot trump either the clear statutory and regulatory language conferring deductibility upon compensatory payments or the case law's sensible emphasis on economic reality.

The government also predicts that if we reject its proffered rule, the result will be the frustration of public policy.  This is so, it says, because those who violate the FCA should, when brought to book, be made to feel the sting of punishment.  This prediction overlooks the provenance of section 162(f), which expressly disallows deductions for fines and penalties.  That statute represents Congress's codification of earlier precedent that was concerned with exactly the same policy

---

[5] The government conjures up a parade of horribles suggesting, for example, that corporations may stall settlement negotiations in order to build up imputed interest.  Despite these glum predictions, we are confident that the world will remain firmly on its axis.  Viewed in real-world terms, we think that — if we may borrow a phrase — the government's "[p]resent fears [a]re less than horrible imaginings."  William Shakespeare, Macbeth, act 1, sc. 3 (circa 1606).

considerations that the government now seeks to invoke. <u>See</u> <u>Stephens</u> v. <u>Comm'r</u>, 905 F.2d 667, 672 (2d Cir. 1990) (limning background to passage of amendments to section 162); <u>see</u> <u>also</u> <u>Tank</u> <u>Truck Rentals, Inc.</u> v. <u>Comm'r</u>, 356 U.S. 30, 35 (1958) (prohibiting deductibility, before passage of section 162(f), where such treatment would severely frustrate sharply defined governmental interest). Because Congress has calibrated this balance, we decline the government's invitation that we recalibrate it by judicial fiat.

To say more about this matter would be to paint the lily. We hold that, in determining the tax treatment of an FCA civil settlement, a court may consider factors beyond the mere presence or absence of a tax characterization agreement between the government and the settling party. Because the district court charged the jury in accordance with this legal regime and the government has not argued that the evidence of record is insufficient to support the jury's verdict, the government's motions for judgment as a matter of law were appropriately denied.

## B. **Jury Instructions**.

The government's remaining claim of error need not detain us. This claim of error implicates the district court's jury instructions. For the most part, this claim rests on the same argument that we considered and rejected in Part II. A, <u>supra</u>. Those arguments are no more persuasive in the context of jury

-16-

instructions and, to the extent that they are repeated, we reject the claim of instructional error out of hand.

The government does, however, offer one additional remonstrance: it calumnizes what it calls the district court's "residual approach" to the question of deductibility. This approach is exemplified, the government says, by the court's instruction that payments can only be considered punitive if they are "above what is necessary" to compensate the government.

Before us, the government faults this rationale, arguing that there is no basis to assume either that settlement payments must be applied to compensatory damages first or that, in settlement negotiations, the government is conceding punitive dollars first. Settlement negotiations, after all, require some level of compromise, with parties seeking agreement on a mutually acceptable discount from the face value of the claim. The government suggests that it would make more sense to apply this settlement discount evenly across the deductible and nondeductible portions of the underlying claim.

The government's argument has a patina of plausibility. When multi-faceted claims are settled, courts sometimes have upheld tax allocations that apply the settlement discount pari passu across the deductible and nondeductible portions of the original claim. See, e.g., Francisco, 267 F.3d at 323; Rozpad, 154 F.3d at 4-5; Delaney, 99 F.3d at 25-26.

-17-

Delaney provides an apt illustration of this praxis. There, the taxpayer won a tort judgment of $287,000, out of which $175,000 (61%) was excludable from taxable income as personal injury damages. See Delaney, 99 F.3d at 22. The remainder of the judgment constituted taxable income (prejudgment interest). See id. While an appeal was pending, the parties settled for $250,000. See id. The Internal Revenue Service prorated the settlement along the lines indicated by the judgment and determined that only 61% was excludable from taxable income. See id. We upheld that proration. See id. at 25-26.

We need not — and do not — reach the merits of this argument. Though it has some plausibility, it comes too late. The government did not clearly articulate this argument in the district court and, in all events, did not raise it in its post-charge objections to the jury instructions.[6] See Fed. R. Civ. P. 51. We have held, with a regularity bordering on the monotonous, that claims of instructional error not seasonably advanced in the trial

_____

[6] At oral argument, the government asserted that its request to have the district court instruct the jury in line with its version of the Talley rule, see text supra, encompassed this point. But Talley does not support the point. Moreover, we have carefully reviewed both the government's proffered instructions and its objections to the district court's charge; and we find nothing in them that resembles the "priority" argument that the government makes on appeal. The fact that acceptance of the Talley rule would have rendered the question of priority moot does not excuse either the government's failure to request the instruction or its failure to object to the instruction's omission from the charge as given. See Romano v. U-Haul Int'l, 233 F.3d 655, 662-63 (1st Cir. 2000).

court are waived and cannot be broached for the first time on appeal.  See, e.g., Ji v. Bose Corp., 626 F.3d 116, 125 (1st Cir. 2010); Muñiz v. Rovira, 373 F.3d 1, 6-7 (1st Cir. 2004); Davis v. Rennie, 264 F.3d 86, 100 (1st Cir. 2001); Wells Real Estate, Inc. v. Greater Lowell Bd. of Realtors, 850 F.2d 803, 809 (1st Cir. 1988).  So it is here.[7]

### III.  CONCLUSION

We need go no further.  For the reasons elucidated above, the judgment of the district court is

**Affirmed.**

---

[7] To be sure, we have some highly circumscribed discretion to reach out for and review unpreserved claims of instructional error. See Muñiz, 373 F.3d at 7.  But this discretion is reserved for exceptional cases and must be exercised sparingly.  See id.; Toscano v. Chandris, S.A., 934 F.2d 383, 385 (1st Cir. 1991).  The case at hand falls within the general waiver rule, not within the long-odds exception to it.