# United States Court of Appeals
## For the First Circuit

No. 20-2093

JEANNETTE RODRÍGUEZ-VALENTIN, in representation of her minor
son, D.A.L.R.,

Plaintiff, Appellee,

v.

DOCTORS' CENTER HOSPITAL (MANATI), INC.,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Bruce J. McGiverin, U.S. Magistrate Judge]

Before

Lynch and Selya, Circuit Judges,
and McCafferty,* District Judge.

Roberto E. Ruiz-Comas, with whom RC Legal & Litigation
Services, PSC was on brief, for appellant.
David Efron, with whom Law Offices of David Efron, P.C. was
on brief, for appellee.

February 24, 2022

---

* Of the District of New Hampshire, sitting by designation.

**MCCAFFERTY**, <u>District Judge</u>.  This medical malpractice suit arises from obstetric care provided to the plaintiff-appellee, Jeannette Rodríguez-Valentin in connection with the birth of her minor son, DALR.  A jury found appellant Doctors' Center Hospital (Manati), Inc. ("Doctors' Center") liable for 8 percent of a $14,296,000 total award.  Doctors' Center appeals the denial of its post-verdict motions for judgment as a matter of law, for a new trial, and for remittitur under Federal Rules of Civil Procedure 50 and 59.  We affirm.

**BACKGROUND**

I.      <u>Complications During DALR's Birth</u>

Rodríguez-Valentin gave birth to DALR by caesarean section at Doctors' Center in Puerto Rico in late September 2008. A few months after his birth, DALR was diagnosed with cerebral palsy.  Rodríguez-Valentin alleged that DALR's cerebral palsy resulted from, or was exacerbated by, medical malpractice by treating physicians and nurses during the late stages of her pregnancy and DALR's delivery.  This appeal by Doctors' Center is pertinent only to the medical care provided by treating nurses employed by Doctors' Center.

The nurses' alleged malpractice occurred during DALR's birth.  Doctors' Center's nurses, per a physician's order, began administering the pharmaceutical drug Pitocin to Rodríguez-Valentin at about 9:31 A.M. on September 25 while she was in labor.

- 2 -

The Pitocin was intended to aid delivery by reducing the time between Rodríguez-Valentin's contractions.

Soon after the nurses administered Pitocin, however, DALR's "heart rate variability," as documented by a monitor placed on Rodríguez-Valentin's abdomen, dropped to a "very minimal level." At trial, Rodríguez-Valentin's expert witness, Dr. Bruce Halbridge, testified that DALR's heart rate variability had been within an appropriate range before the nurses administered Pitocin. Dr. Halbridge explained that the drop in heart rate variability from that appropriate range showed that DALR was not receiving enough oxygen, glucose, or blood through the placenta. Dr. Halbridge noted that such a loss of heart rate variability is the most important signal that a soon-to-be-born baby lacks sufficient oxygen.

Dr. Halbridge identified where and when the nurses should have seen the changes in heart rate variability. Specifically, according to Dr. Halbridge, DALR's heart rate variability issues occurred in several, sometimes prolonged, "episodes" throughout Rodríguez-Valentin's labor. Dr. Halbridge testified that, in his opinion, by the third "episode" of decreased heart rate variability, the treating nurses should have stopped administering Pitocin, placed Rodríguez-Valentin on her left side, increased her IV fluid intake, provided her with an oxygen mask,

and notified a physician about the drop in DALR's heart rate variability.

Rodríguez-Valentin's labor continued for eight hours after the nurses began administering Pitocin. During this time the treating nurses failed to recognize or act on the drop in DALR's heart rate variability, failed to stop administering Pitocin, and failed to notify any physician about the change in DALR's heart rate variability.

Dr. Halbridge testified that oxygen deprivation during the delivery increased DALR's brain damage and aggravated his cerebral palsy. Dr. Halbridge noted that, had the nurses notified a physician, the caesarean section could also have been expedited, which likely would have reduced the severity of DALR's injuries because he would have spent less time without sufficient oxygen.

In defense of the nurses' conduct, Doctors' Center offered the testimony of two expert witnesses in obstetrics, Dr. Alberto de la Vega Pujol and Dr. Edgar Solis. These physicians disagreed with Dr. Halbridge, opining that DALR's heart rate variability was adequate during labor and that there was no evidence that DALR suffered any oxygen deficiency during delivery. Dr. Solis also testified that neuroradiological testing conducted after DALR's birth supported his opinion that DALR did not suffer from oxygen deficiency during delivery.

- 4 -

II.     Testimony about DALR's Life Care Expenses

Rodríguez-Valentin claimed considerable damages for DALR's future life care costs. Specifically, Gerri Pennachio testified for Rodríguez-Valentin as a "life care planning expert," opining about the yearly cost of DALR's care and treatment. According to Pennachio, these costs would include necessary equipment, doctor visits, testing, and physical therapy, among other items. Pennachio determined that DALR would require $278,021.57 per year until age 18. After age 18, Pennachio opined, DALR would need $379,235.57 per year.

On cross-examination, Doctors' Center dissected Pennachio's calculations, asking her whether she had offset the yearly amounts by contributions made by insurance or the government and whether she had based her calculations on costs in Florida (where DALR lived at the time of trial) as opposed to Massachusetts (where DALR had lived before moving to Florida). Pennachio acknowledged that she had not offset her calculations based on contributions made by insurance or the government. She did not dispute that she derived her calculations from cost information in Massachusetts even though, at the time of trial, Rodríguez-Valentin and DALR lived in Florida.

Additionally, Pennachio acknowledged on cross-examination that she did not discount her yearly estimates to present value. Rather, she opined, the cost increases for DALR's

medical care and life care over his lifetime would offset any applicable discount rate.

Per a pre-trial ruling on Doctors' Center's motion in limine, the court prohibited Pennachio (who lacked requisite expertise) from opining about DALR's life expectancy given his medical condition.[1]  Ultimately, neither Doctors' Center nor Rodríguez-Valentin presented any expert testimony about DALR's life expectancy.

III.     Jury Instructions and Verdict

Consistent with the parties' proposed instructions, the court instructed the jury that it could award compensatory damages to Rodríguez-Valentin and DALR for damages they were "reasonably likely to suffer in the future."  It instructed the jury that it should be "guided by common sense" in fashioning any award and that it could not engage in "arbitrary guesswork."  The court added that the law does not require proof of the amount of damages "with mathematical precision but only with as much definiteness and accuracy as the circumstances permit."  It asked the jury to use "sound discretion" and to draw "reasonable inferences" where appropriate from the "facts and circumstances in evidence."

---

[1] In addition, prior to Pennachio's testimony, the court denied a motion by Doctors' Center to limit Pennachio's testimony to only one year of expenses.

With respect to DALR's life expectancy, Doctors' Center did not seek either a ruling from the judge that life expectancy must be proved by expert testimony or a suitable modification to the court's jury instruction on damages. Nor did Doctors' Center request a special verdict form on DALR's life expectancy. In the end, Doctors' Center permitted the case to go to the jury without making any argument about how the lack of expert testimony on life expectancy should impact the jury's calculation of DALR's future life care costs.[2]

The jury found Doctors' Center liable and awarded $12,996,000 in future life care costs to Rodríguez-Valentin and DALR. The jury awarded an additional $1,300,000 for physical and emotional pain and suffering. The jury apportioned 92 percent of that liability to two treating physicians with whom Rodríguez-Valentin settled prior to trial. The jury apportioned to Doctors' Center the remaining 8 percent, which sums to $1,143,680.

---

[2] During closing arguments, Doctors' Center objected to Rodríguez-Valentin's observation that there was no evidence presented by either side about life expectancy on the ground that Rodríguez-Valentin's counsel was improperly "talking about life expectancy." The court overruled Doctors' Center's objection.

IV.     Post-Verdict Motions

After the jury's verdict, Doctors' Center renewed[3] a motion for judgment as a matter of law under Rule 50 and moved for a new trial and/or remittitur of the damages award under Rule 59.[4] Doctors' Center argued, as it does on appeal, that Rodríguez-Valentin's evidence was insufficient to support the jury's verdict as to liability or, alternatively, that the weight of the evidence required the jury's verdict to be overturned and a new trial to be held. As to remittitur of the damages award or a new trial on damages, Doctors' Center argued that the jury's award for future life care costs was speculative because Rodríguez-Valentin failed to submit expert testimony about DALR's life expectancy. Doctors' Center also argued that Pennachio's calculations were deficient.

The district court denied Doctors' Center's motions. As to Doctors' Center's motions for judgment as a matter of law and for a new trial on liability, the district court found that Dr. Halbridge's testimony supported the jury's verdict. As to the motion for a new trial on damages and/or remittitur, the district

---

[3] As it was required to do to preserve its arguments, Doctors' Center moved for judgment as a matter of law for the first time before the matter was submitted to the jury. See Fed. R. Civ. P. 50(a); Santos-Arrieta v. Hospital del Maestro, 14 F.4th 1, 8 (1st Cir. 2021). The district court deferred ruling on the motion, and Doctors' Center renewed its motion after the jury's verdict.

[4] Doctors' Center filed its three motions together as part of one omnibus legal document.

court stated that the jury could have determined that DALR's life expectancy was 46 years[5] by dividing the award for future care costs by the amount that Pennachio testified DALR would require for care each year. The district court, however, acknowledged that the life expectancy of a child with cerebral palsy "likely would be a proper subject for expert testimony." Nonetheless, the district court concluded that the jury in this case could issue an award for future costs without expert testimony on life expectancy because damages in a negligence action need not be shown with mathematical certainty.

The court also stated that other jurisdictions permit a jury to infer life expectancy from testimony about the injured person's medical condition and pain and suffering. While acknowledging that "the far better practice would have been for both parties to present competent expert testimony of plaintiff's life expectancy," the district court found that the jurors could make a reasonable estimate of DALR's life expectancy based on their common sense, personal knowledge, and experience. The district court also reasoned that the jury heard and rejected Doctors' Center's arguments about errors in Pennachio's calculations for DALR's future life care costs.

---

[5] DALR was 10 years old at the time of trial, so, under these calculations, he would be expected to live another 36 years.

**DISCUSSION**

Doctors' Center appeals the district court's denial of its motions for judgment as a matter of law, for a new trial, and for remittitur of the jury's damages award. We address each matter in turn, and, in the end, affirm the district court's rulings.

I.      Judgment as a Matter of Law

Doctors' Center challenges the district court's denial of its renewed motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b). Doctors' Center contends that the district court erred by denying the motion because Doctors' Center presented the expert testimony of Drs. de la Vega and Solis, both of whom opined, in contention with Dr. Halbridge, that the nurses acted appropriately under the circumstances.

The court reviews de novo the denial of a renewed, post-verdict motion for judgment as a matter of law under Rule 50(b). See Fresenius Med. Care Holdings, Inc. v. United States, 763 F.3d 64, 67 (1st Cir. 2014). "If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue," the court can order a new trial or direct the entry of judgment in the moving party's favor as a matter of law. See Fed. R. Civ. P. 50(a)-(b). A trial court evaluating a motion for judgment as a matter of law under Rule 50(b) must "view the evidence in the light most flattering to the

- 10 -

verdict and must draw all reasonable inferences therefrom in favor of the verdict." Fresenius, 763 F.3d at 67-68.

Under Puerto Rico law,[6] to prove medical malpractice the plaintiff must demonstrate, by a preponderance of the evidence, an applicable standard of care, that the defendant acted or failed to act in violation of the applicable standard of care, and a sufficient causal connection between the defendant's act or failure to act and the plaintiff's injuries. See Pagés-Ramírez v. Ramírez-González, 605 F.3d 109, 113 (1st Cir. 2010). Viewing the evidence in the light most favorable to Rodríguez-Valentin, the jury's verdict finding Doctors' Center liable for medical malpractice is supported by the evidence. The district court did not err in denying Doctors' Center's motion for judgment as a matter of law.

Doctors' Center's primary argument is that the district court should have given greater weight to the testimony of its experts as opposed to that of Dr. Halbridge. But, as the district court found, Dr. Halbridge's opinion (i.e., that the nurses breached the applicable standard of care by failing to stop administering Pitocin and by failing to inform treating physicians that DALR's heart rate variability had decreased) was sufficient

---

[6] The substantive law of Puerto Rico controls in this diversity suit. See Cortés-Irizarry v. Corporación Insular de Seguros, 111 F.3d 184, 189 (1st Cir. 1997).

to support the jury's verdict as to those issues. The jury was entitled to credit Dr. Halbridge's testimony over that of Drs. de la Vega or Solis. See Feliciano-Hill v. Principi, 439 F.3d 18, 26 (1st Cir. 2006); Lama v. Borras, 16 F.3d 473, 478 (1st Cir. 1994).

Doctors' Center also argues that the jury could not find liability based on Dr. Halbridge's testimony because he opined that the nurses breached a standard of care applicable generally in the United States as opposed to a standard of care specific to Puerto Rico. We find no merit to Doctors' Center's argument. The district court instructed the jury that the standard of care in this case was "equal to the degree of care exercised by other nurses in the same or similar localities."[7] Dr. Halbridge, having described what the applicable standard of care for the nurses would be, added that, as to the nurses in this case, the standard of care was the same as the standard of care in the United States generally. For purposes of this case, the jury was entitled to credit Dr. Halbridge's opinion that the applicable standards of care in Puerto Rico and the rest of the United States are the same. See Lama, 16 F.3d at 478.

Doctors' Center's other arguments about the sufficiency of the evidence are without merit and do not warrant further

---

[7] Since it is not a matter challenged on appeal, we make no ruling about whether the district court's instruction was the correct interpretation of Puerto Rico law.

- 12 -

discussion.  The district court correctly denied Doctors' Center's motion for judgment as a matter of law.

II.        Motion for a New Trial as to Liability

Leveraging the same arguments presented in its motion for judgment as a matter of law under Rule 50, Doctors' Center contends that the district court erred by denying its motion for a new trial under Federal Rule of Civil Procedure 59.  Under Rule 59, "[t]he court may, on motion, grant a new trial on all or some of the issues -- and to any party -- . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court."  Fed. R. Civ. P. 59(a)(1)(A).  "A district court's power to grant a motion for new trial is much broader than its power to grant a [Rule 50 motion.]"  Jennings v. Jones, 587 F.3d 430, 436 (1st Cir. 2009).

A trial judge may grant a new trial if the jury's verdict is "against the weight of the evidence" or if "action is required in order to prevent injustice."  Id. at 436.  A district court can independently weigh the evidence when evaluating a motion for a new trial under Rule 59 and therefore can determine that a witness or evidence lacks credibility; in other words, the court need not take the evidence in the light most favorable to the nonmoving party.  Id.

At the same time, trial judges "do not sit as thirteenth jurors, empowered to reject any verdict with which they disagree."

<u>Id.</u>  Indeed, when reviewing a denial of a motion for new trial that was, at bottom, based on sufficiency of the evidence, the standards under Rule 50 and Rule 59 effectively "merge."  <u>See</u> <u>Dimanche</u> v. <u>Mass. Bay Transp. Auth.</u>, 893 F.3d 1, 8 n.9 (1st Cir. 2018).  Moreover, our review of the district court's denial of Doctors' Center's motion for a new trial is only for abuse of discretion.  <u>Jennings</u>, 587 F.3d at 435-37.

Considering the deferential abuse-of-discretion standard alongside the reality that Doctors' Center's arguments under Rule 59 and Rule 50 are based on the same sufficiency-of-the-evidence grounds, we affirm the district court's denial of Doctors' Center's motion for a new trial as to its liability.  In other words, consideration of the same facts that lead us to affirm the district court's denial of the motion as brought under Rule 50 likewise lead us to affirm as to Rule 59.  Dr. Halbridge was a qualified expert witness who testified that Doctors' Center's nurses breached the applicable standard of care during Rodríguez-Valentin's labor and DALR's birth.  He explained why that breach of the standard of care caused or aggravated DALR's injuries.  The jury was entitled to credit Dr. Halbridge's testimony over that of Doctors' Center's experts.  The district court did not abuse its discretion in deferring to the jury's credibility findings.

Doctors' Center points to no facts that convince us the jury's verdict as to liability was against the weight of the

evidence or was otherwise unjust. Indeed, the district court's analysis of the evidence presented at trial was accurate, thoughtful, and thorough, leaving us with no doubt that the decision was within its considerable discretion. See id. at 441.

III.     Motions for a New Trial on Damages or Remittitur of Future Life Care Costs Award

Lastly, Doctors' Center contends that the district court abused its discretion by denying its motion for a new trial or remittitur on the ground that the jury's $12,966,000 award for DALR's future life care costs was excessive and unsupported by the evidence. Specifically, Doctors' Center argues that the award for future care costs should be reduced, or a new trial on damages granted, because Rodríguez-Valentin presented no expert testimony about DALR's life expectancy and because Pennachio based her calculations on erroneous assumptions.

As with motions for a new trial on liability, appellate review for denial of a motion for a new trial on damages or remittitur under Rule 59 is for abuse of discretion. See id. at 435-36. The denial of such a motion "will be reversed only if 'the jury's verdict exceeds any rational appraisal or estimate of the damages that could be based on the evidence before the jury.'" Astro-Med, Inc. v. Nihon Kohden Am., Inc., 591 F.3d 1, 13 (1st Cir. 2009) (quoting Smith v. Kmart Corp., 177 F.3d 19, 29 (1st Cir. 1999)). When evaluating a motion for a new trial on damages,

or for remittitur, the court considers the evidence in the light most favorable to the prevailing party. Wortley v. Camplin, 333 F.3d 284, 297 (1st Cir. 2003).

Under Rule 59, an award for future life care costs is rational when it is supported by the evidence, reasonable inferences from that evidence, and the jury's common sense, as opposed to speculation or conjecture. See Astro-Med, Inc., 591 F.3d at 13; Climent-García v. Autoridad de Transporte Marítimo y Las Islas Municipio, 754 F.3d 17, 23-24 (1st Cir. 2014). And a district court does not abuse its discretion by declining to reduce a jury's verdict or award a new trial where the grounds for doing so derive from the movant's speculation about what the jury might have found or what evidence not presented might have demonstrated. See Loan Modification Grp., Inc. v. Reed, 694 F.3d 145, 154 (1st Cir. 2012). Here, the jury's verdict was not beyond "any rational appraisal or estimate of the damages that could be based upon the evidence before the jury." See id. Doctors' Center's arguments fail to convince us otherwise.

First, Doctors' Center contends that the district court abused its discretion by denying its motion under Rule 59 because Rodríguez-Valentin did not present expert testimony about DALR's life expectancy. Specifically, Doctors' Center argues that, under Puerto Rico law, an award for future care costs is speculative unless the plaintiff submits expert testimony about his or her

- 16 -

life expectancy.  Given the procedural posture of this case and waivers by Doctors' Center, as explained below, we do not reach the legal question of whether Puerto Rico law requires such expert testimony.

Doctors' Center did not timely argue to the district court that the jury could consider DALR's future care costs only by reference to expert testimony.  Similarly, Doctors' Center did not timely argue that the jury had to make an estimate of DALR's life expectancy, or even that it needed to calculate DALR's future care costs in any particular way.  Indeed, Doctors' Center's life expectancy argument was not part of its motion for judgment as a matter of law.  It was neither reflected in any of Doctors' Center's proposed jury instructions nor posed as an objection.  Likewise, Doctors' Center did not ask for a special verdict form that would have required the jury to decide or agree upon DALR's life expectancy.

Instead, Doctors' Center first argued that expert testimony on life expectancy was required after the jury delivered an adverse verdict, in the context of a motion for a new trial or remittitur reviewable only for abuse of discretion.[8]  Because the district court had, without objection, already instructed the jury

---

[8] In its earlier motion in limine, Doctors' Center argued that Pennachio should be precluded from testifying about DALR's life expectancy.  Doctors' Center did not argue that the jury could not award future costs without expert testimony about life expectancy.

- 17 -

on how to calculate damages for future life care costs, Doctors' Center's argument that the jury could not, as a matter of law, return a damages award for future life care costs without expert testimony on life expectancy came much too late.

In other words, Doctors' Center knew before the jury was instructed that no expert testimony had been presented on life expectancy and that none would be. Nonetheless, Doctors' Center neither moved for judgment as a matter of law on that ground nor offered a jury instruction asking the jury to estimate and agree on DALR's life expectancy or to calculate that figure in any particular way. See Cheshire Med. Ctr. v. W.R. Grace & Co., 49 F.3d 26, 35-36 (1st Cir. 1995) (affirming denial of motion for a new trial where moving party failed to "object precisely on" the pertinent ground and failed to "propose[] to the trial judge an acceptable instruction to the jury"). And, Doctors' Center voiced no objection to the district court's instruction on calculating damages, which was, in short, to award Rodríguez-Valentin "fair compensation" of a "reasonable" amount to compensate her and DALR for physical, emotional, and economic injuries to whatever extent Doctors' Center was legally liable.

With no pertinent argument made by Doctors' Center before the case was submitted to the jury, the district court's jury instructions are the law of the case. United States v. Oliver, 19 F.4th 512, 517 (1st Cir. 2021) ("Because the defendant

- 18 -

neither objected to the district court's instructions below nor assigns error to them on appeal, we treat the instructions as the law of the case."); United States v. Kilmartin, 944 F.3d 315, 328-29 (1st Cir. 2019) (holding that an unobjected-to jury instruction that is neither patently incorrect nor internally inconsistent becomes the law of the case); Moore v. Murphy, 47 F.3d 8, 11 (1st Cir. 1995) ("The failure to object to the instructions at the time, and in the manner, designated by Rule 51 is treated as a procedural default, with the result that the jury instructions, even if erroneous, become the law of that particular case.").

At best, we can review the district court's instructions on this issue for plain error. See Fed. R. Civ. P. 51(c)-(d) (stating when objections to jury instructions must be made and that the consequence for failing to timely object to a jury instruction is review for "plain error" that "affects substantial rights"); Sindi v. El-Moslimany, 896 F.3d 1, 19-20 (1st Cir. 2018) ("It is black-letter law that claims of instructional error not seasonably advanced in the district court can be broached on appeal only for plain error."); see also P.R. Hosp. Supply, Inc. v. Boston Sci. Corp., 426 F.3d 503, 505 (1st Cir. 2005) ("In general, 'a party may not appeal from an error to which he contributed, either by failing to object or by affirmatively presenting to the court the wrong law.'"). For Doctors' Center to prevail under plain error review, we must at least conclude that the claimed error was

- 19 -

clear or obvious.  See Sindi, 896 F.3d at 19-20; Babcock v. Gen. Motors Corp., 299 F.3d 60, 65 (1st Cir. 2002).[9]

We cannot do so here.  Doctors' Center offers no authority demonstrating that it is clearly the case under Puerto Rico law that a plaintiff must present expert testimony about life expectancy to receive damages for future care costs in a medical malpractice action.  Although we agree with the district court that presenting expert testimony about life expectancy is the best practice in a medical malpractice case involving an uncommon and severe medical condition and a request for future costs, we can find no authority clearly establishing that such expert testimony is necessary to recover damages for future care costs as a matter of law in Puerto Rico.  Rather, the only arguably relevant authorities offered here are the Puerto Rico Supreme Court cases relied on by the district court in denying Doctors' Center's motion, Zambrana v. Hospital Santo Asilo de Damas, 9 P.R. Offic. Trans. 687, 692 (1980), and Suro v. E.L.A, 111 P.R. Dec. 456, 461 (1981), which merely stand for the general principle that damages need not be computed with mathematical rigor or precision.

---

[9] As we conclude that there was no clear or obvious error, we need not reach the other aspects of plain error, which include whether the claimed error affected the appellant's substantial rights and "seriously impaired the fairness, integrity, or public reputation of judicial proceedings." Fothergill v. United States, 566 F.3d 248, 251-52 (1st Cir. 2009).

- 20 -

Thus, if there were any error under Puerto Rico law in the district court's instructions on how to calculate damages, it was not plain.  See Sindi, 896 F.3d at 19-20; Babcock, 299 F.3d at 65.  Considering those instructions, the evidence that was presented, and Doctors' Center's failure to timely raise its legal argument on the need for expert testimony on life expectancy, the district court did not abuse its discretion in denying the motion.

Finally, Doctors' Center takes issue with Pennachio's opinion about DALR's future life care costs because Pennachio did not discount her calculations to present value, used numbers based on costs in Massachusetts instead of Florida, and did not offset her calculations for possible contributions by insurers or the government.  The jury, however, heard extensive evidence about DALR's condition and the care that he required.  The district court allowed Doctors' Center substantial leeway in cross-examining Pennachio about the accuracy of her calculations.[10]  Doctors' Center's cross-examination of Pennachio included questions about whether she discounted her numbers to present value, whether she used accurate regional cost-of-living expenses, and whether she considered potential offsetting contributions.  And Pennachio

_____

[10] On appeal, Doctors' Center challenges the methodology of Pennachio's opinions and does so only in the context of a new trial or remittitur, as opposed to admissibility under the Federal Rules of Evidence.  Doctors' Center does not challenge Pennachio's expertise.

explained, as one example, that her methodology did not require discounting her numbers to present value because the prospect of inflation offset the discount rate. The jury was therefore able to assess Pennachio's testimony, including Doctors' Center's criticisms of her methodology, in fashioning its damages award. See Casco, Inc. v. John Deere Constr. & Forestry Co., 990 F.3d 1, 13-14 (1st Cir. 2021) (rejecting argument that a new trial or remittitur was necessary due to claimed methodological errors by plaintiff's damages expert).

Doctors' Center's other arguments regarding the jury's damages award -- including its contention that the damages are excessive in light of comparable cases -- are unpersuasive and do not merit discussion.

At bottom, the jury's verdict was not beyond "any rational appraisal or estimate of the damages that could be based upon the evidence before the jury." Accordingly, the district court did not abuse its discretion in denying Doctors' Center's motion for a new trial and, in the alternative, remittitur.

#### CONCLUSION

In sum, the district court did not err or abuse its discretion in deferring to the jury's evaluation of the evidence. Accordingly, the district court's order denying Doctors' Center's motions for judgment as a matter of law, for a new trial, or for remittitur is affirmed.